PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3979
_____

JACKIE NICHOLS,
Appellant

v.

CITY OF REHOBOTH BEACH;
SAM COOPER, Mayor of Rehoboth;
SHARON LYNN, City Manager of Rehoboth
_____

On Appeal from the United States District Court
for the District of Delaware
(D. DE No. 1-15-cv-00602)
District Judge:  Honorable Gregory M. Sleet
_____

Argued April 7, 2016
Before:  FISHER, COWEN, and RENDELL, *Circuit Judges*.

(Filed: September 7, 2016)

David L. Finger, Esq.  [*ARGUED*]
Finger & Slanina
1201 Orange Street

One Commerce Center, Suite 725
Wilmington, DE 19801
*Counsel for Appellant*

Max B. Walton, I, Esq. [*ARGUED*]
Connolly Gallagher
267 East Main Street
Newark, Delaware 19711

Matthew F. Boyer, Esq.
Ryan P. Newell, Esq.
Arthur G. Connolly, III, Esq.
Connolly Gallagher
1000 West Street
The Brandywine Building, Suite 1400
Wilmington, DE 19801
                    *Counsel for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Jackie Nichols is a resident, property owner, and taxpayer in the City of Rehoboth Beach, Delaware. Rehoboth Beach held a special election—open to residents of more than six months—for approval of a $52.5 million bond issue, and the resolution passed. Nichols voted in the election. She then filed this civil action challenging the election and the resultant issuance of bonds. The District Court found that Nichols

lacked standing and dismissed the case. The sole issue on appeal is whether Nichols had, as she claims, municipal taxpayer standing to make such a challenge. Because Nichols has failed to show an illegal use of municipal taxpayer funds—and therefore cannot establish standing on municipal taxpayer grounds—we will affirm the District Court's Order.

## I.

### A.

The facts of this case are simple. On April 27, 2015, the Board of Commissioners of Rehoboth Beach adopted a resolution proposing the issuance of up to $52.5 million in general obligation bonds to finance an ocean outfall project. The resolution followed an initial resolution and a public hearing, as required by Section 40(d)-(e) of Rehoboth Beach's City Charter. Pursuant to the City Charter, Rehoboth Beach held a special election on June 27, 2015, to determine whether it was authorized to borrow funds to finance the project. Rehoboth Beach expended municipal funds on the special election: first, before the election, it used taxpayer funds to place a full-page advertisement in a local newspaper urging the voters to "Vote Yes" in favor of the proposed outfall project; second, the costs of the special election were paid from the Rehoboth Beach treasury.

The Rehoboth Beach City Charter governs the voting procedures for special elections. Section 40(h) of the Charter states the following:

> At the said Special Election, every owner or leaseholder, as defined in this Charter, of property, whether an individual, partnership or corporation, shall have one vote and every person who is a bona fide resident of the City of Rehoboth Beach, but who is not an owner or

3

> leaseholder, as defined in this Charter, of
> property within the corporate limits of the City
> of Rehoboth Beach and who would be entitled
> at the time of holding of the said Special
> Election to register and vote in the Annual
> Municipal Election if such Annual Municipal
> Election were held on the day of the Special
> Election shall have one vote whether or not
> such person be registered to vote in the Annual
> Municipal Election.

Charter of Rehoboth Beach § 40(h) (1963),
http://charters.delaware.gov/rehobothbeach.pdf. Section 40
does not define the term "bona fide resident," but Section 7 of
the Charter, which deals with the manner of holding annual
elections, defines the term "resident" as "an individual
actually residing and domiciled in the City of Rehoboth
Beach for a period of six months immediately preceding the
date of the election." *Id.* § 7(d).

At the special election, Rehoboth Beach accepted only
voters who were either property owners or who had been
residents for a minimum of six months. Corporations and
other artificial entities that owned property in Rehoboth
Beach were also permitted to vote. Nichols alleges that
persons who owned several parcels of property in Rehoboth
Beach through the ownership of artificial entities were
granted one vote for each parcel owned. She further alleges
that those who qualified as residents and who owned property
were granted two votes. The votes of the special election were
tallied, and the majority of eligible voters approved the
issuance of the general obligation bonds—637 votes to 606
votes. Nichols is a property owner in Rehoboth Beach and
voted in the special election.

4

**B**.

Nichols filed this action 19 days after the special election vote took place. About a month later, she filed a four-count amended complaint against the City of Rehoboth Beach, Sam Cooper (mayor of Rehoboth Beach), and Sharon Lynn (city manager of Rehoboth Beach). In Counts I and II of the amended complaint, Nichols alleged that Rehoboth Beach violated the Fourteenth Amendment by requiring voters to live in, or hold property in, Rehoboth Beach for six months before being entitled to vote as residents. In Count III, she alleged that Rehoboth Beach violated the Fourteenth Amendment by allowing property owners to vote more than once. Count IV was a pendent state law claim for "exceeding authority" in which Nichols alleged that Rehoboth Beach had violated Delaware law by purchasing the newspaper advertisement encouraging voters to support the issuance of bonds.

Rehoboth Beach filed a motion to dismiss Nichols's amended complaint, arguing, among other things, that Nichols lacked standing because, as a resident and property owner, she had voted in the election and had thus suffered no injury. The District Court issued a memorandum opinion and order granting Rehoboth Beach's motion and dismissing the case for lack of subject matter jurisdiction. The District Court explained:

> The court agrees with Defendants that Nichols lacks standing. Initially, the court agrees with Defendants that Nichols is not contesting the expenditure of tax funds, but the legality of the Special Election. Second, the court notes that Nichols suffered no particularized injury as a result of the Special Election. Nichols is a

> property owner in the city and had the right to
> vote in the Special Referenda Election. Thus,
> she lacks the concrete personal injury necessary
> to bring suit. As a result, the court lacks the
> subject matter jurisdiction to hear this action.

(App. 19–20.) Having concluded that it lacked subject matter jurisdiction, the District Court did not address any of Rehoboth Beach's remaining arguments. Nichols timely appealed.

## II.

"We have jurisdiction pursuant to 28 U.S.C. § 1291 over a dismissal for lack of subject matter jurisdiction, and our review for lack of subject matter jurisdiction is plenary." *Swiger v. Allegheny Energy, Inc.*, 540 F.3d 179, 180 (3d Cir. 2008).

## III.

Nichols argues that the District Court misperceived her allegations and that she has standing—not as a voter but as a municipal taxpayer. She presents two bases upon which we could find that she has municipal taxpayer standing to bring her case. First, she argues that she has standing to challenge the $52.5 million in municipal debt incurred by an allegedly unlawful special election. Second, she contends that she has standing to challenge Rehoboth Beach's use of municipal funds to hold the special election and to purchase a newspaper advertisement in support of that election. Nichols's first argument fails because she has not challenged the expenditure of the $52.5 million, merely the special election that approved the issuance of the bonds. Her second argument fails because she has not alleged a direct link

between the expenditure of municipal funds and the challenged aspect of the municipal action and because those expenditures were de minimis.

### A.    Municipal Taxpayer Standing

"Article III of the Constitution limits the judicial power of the United States to the resolution of Cases and Controversies, and Article III standing enforces the Constitution's case-or-controversy requirement." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597–98 (2007) (internal quotation marks and alterations omitted). "One of the controlling elements in the definition of a case or controversy under Article III is standing." *Id.* at 598 (internal quotation marks and alterations omitted). The elements necessary for establishing "the irreducible constitutional minimum of standing" under Article III are as follows:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (internal quotation marks, citations, and alterations omitted).

The Supreme Court has roundly rejected federal taxpayer standing noting that a federal taxpayer's interest "in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable 'personal injury' required for Article III standing." *Hein*, 551 U.S. at 599 (explaining that an "interest in ensuring that [federal] funds are not *used* by the Government in a way that violates the Constitution" is "too generalized and attenuated to support Article III standing"). This follows from the fact that a federal taxpayer's

> interest in the moneys of the treasury . . . is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

*Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923); *see also Doremus v. Bd. of Ed. of Hawthorne*, 342 U.S. 429, 433 (1952) (reiterating that "the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure").

Likewise, "state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006). Federal and state taxpayers cannot show Article III standing based on their status as taxpayers "because the alleged injury is not concrete and particularized, but instead a grievance the taxpayer suffers in some indefinite way in common with people

generally." *Id.* at 344 (internal citations and quotation marks omitted). "In addition, the injury is not actual or imminent, but instead conjectural or hypothetical." *Id.* (internal quotation marks omitted).

The Supreme Court has, however, allowed one form of taxpayer standing to survive: standing based on municipal taxpayer status. This difference in the treatment of municipal taxpayers is justified, at least in theory, by the closeness between the municipal taxpayer and the expenditure of municipal taxpayer funds. As explained in *Frothingham*:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this court. . . . The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation.

262 U.S. at 486–87. Thus, unlike a state or federal taxpayer, a municipal taxpayer may challenge certain expenditures of municipal funds in federal court.

Though a municipal taxpayer may, in some cases, challenge municipal expenditures, her right to do so is not unlimited. We have applied the "good-faith pocketbook" requirements, articulated by the Supreme Court in *Doremus*, to municipal taxpayer standing. *Doremus*, 342 U.S. at 434 (explaining that "a good-faith pocketbook action" is one in which a plaintiff alleges "a direct dollars-and-cents injury").

The municipal taxpayer plaintiffs in *Doremus* challenged a state law mandating Bible reading in public schools. 342 U.S. at 430–31. The Supreme Court concluded that they lacked standing as municipal taxpayers because they failed to show that the Bible reading resulted in any direct monetary cost. *Id.* at 431 ("[I]t is neither conceded nor proved that the brief interruption in the day's schooling caused by compliance with the statute adds cost to the school expenses or varies by more than an incomputable scintilla the economy of the day's work."). The plaintiffs made no allegation that the Bible reading was "supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of the school." *Id.* at 433. Furthermore, the plaintiffs failed to show that the Bible reading had any impact on their overall tax burden. *Id.* ("No information is given as to what kind of taxes are paid by appellants and there is no averment that the Bible reading increases any tax they do pay or that as taxpayers they are, will, or possibly can be out of pocket because of it."). Thus, the Supreme Court made clear in *Doremus* that in order for a municipal taxpayer to have standing in federal court, she must demonstrate (1) that a particular expenditure accompanied the allegedly illegal practice and (2) that it put her "out of pocket."

Accordingly, in *ACLU-NJ v. Township of Wall*, we recognized that, following *Doremus*, plaintiffs must "establish more than a potential de minimis drain on tax revenues due to the [allegedly unconstitutional conduct]." 246 F.3d 258, 262 (3d Cir. 2001). In *ACLU-NJ*, residents of Wall Township, New Jersey, filed a suit against the Township, alleging that the Township's holiday display violated the Establishment Clause of the First Amendment. *Id.* at 260. The holiday display consisted of a variety of holiday items, including a crèche and a menorah. We observed that, even

though the Township "own[ed] the Nativity display, and presumably the menorah, and the overall display [was] set up with defendant's support, direction and/or approval," the Township did not "maintain" the display. *Id.* at 263. As such, we held that the plaintiffs lacked standing because they "failed to establish an expenditure on the challenged elements of the [holiday] display." *Id.* at 263–64. The Township did not expend funds by displaying the religious elements it owned. A plaintiff must therefore establish a municipal expenditure on the *challenged aspect* of the disputed practice in order to have municipal taxpayer standing.

We further clarified that, even if the Township had used its own paid employees to erect the display, or had used Township funds to light it, we would not, without further evidence, assume that such expenditures amounted to anything more than de minimis expenditures. And, consistent with *Doremus*, de minimis expenditures attributable to the challenged practice are insufficient to confer Article III standing. Therefore, a municipal taxpayer plaintiff must show (1) that he pays taxes to the municipal entity, and (2) that more than a de minimis amount of tax revenue has been expended on the challenged practice itself. *ACLU-NJ*, 246 F.3d at 263–64; *see also Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 282 (5th Cir. 1999).

## B.    The Issuance of Bonds

As an initial observation, we agree with the District Court that "Nichols is not contesting the expenditure of tax funds, but the legality of the Special Election." (App. 19–20.) We are not faced with the question of whether Nichols would have had standing to challenge these voting requirements under different circumstances—e.g., in a case where she was not permitted to vote. Certainly, as the District Court

recognized, Nichols was both a property owner in and a resident of Rehoboth Beach and therefore has no basis to challenge the voting requirements directly. Instead, Nichols has attempted to remedy her lack of traditional "injury-in-fact" by asserting municipal taxpayer standing. This she cannot do.[1]

In order for a plaintiff to gain access to federal court using municipal taxpayer standing, she must show that the municipality has actually expended funds on the allegedly illegal elements of the disputed practice. Nichols's argument on appeal fails to grasp this inherent requirement, despite her recognition that "[m]unicipal taxpayer standing is available when there is an expenditure of municipal tax funds on an

---

[1] Nichols waives any argument that she has standing as a voter, *see* Appellant's Br. 15 ("The particular injury was to Ms. Nichols as a municipal taxpayer, not as a voter . . . ."), but mentions parenthetically that "the dilution of her vote as a result of those unlawful rules should provide an independent ground for her standing," *id.* This position is developed only in a footnote with a brief citation to authority. Any argument that she has standing as a voter is accordingly waived. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."). The Dissent "question[s] whether anyone else would be a more suitable plaintiff to litigate . . . the 'one person, one vote' claim." Dissent, lines 284–85. We do not pass judgment on whether Nichols would be an appropriate plaintiff to make such a challenge since she waived her ability to challenge the voting requirements directly.

unconstitutional practice." Appellant's Br. 8.[2] Because the $52.5 million was not spent on an illegal practice, Nichols cannot assert municipal taxpayer standing to challenge the expenditure.

The Dissent mischaracterizes the nature of the injury Nichols alleged and asserts that the proposed issuance of $52.5 million in general obligation bonds satisfies the injury requirement. Dissent, Lines 91–93. Certainly, if $52.5 million had been expended on an illegal practice, this would be a different case. But Nichols did not allege that there was anything illegal about what the $52.5 million was to be expended *on*. The only expenditure that Nichols can challenge is the cost of holding the special election—not the resultant issuance of bonds—and, as we will explain below, those funds would have been expended regardless of whether the voting requirements were unconstitutional or not.

---

[2] The cases that Nichols cites illustrate that municipal taxpayer standing exists only in cases where plaintiffs seek to challenge unlawful *expenditures*. *See, e.g.*, *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 210 (6th Cir. 2011) ("[M]unicipal taxpayers may fulfill the injury requirement by pleading an alleged misuse of municipal funds."); *Bd. of Ed. v. N.Y. Teachers Ret. Sys.*, 60 F.3d 106, 110 (2d Cir. 1995) ("[A] municipal taxpayer has standing to challenge allegedly unlawful municipal expenditures."); *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991) ("[M]unicipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds. . . ."); *see also Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988) ("A plaintiff's status as a municipal taxpayer is irrelevant for standing purposes if no tax money is spent on the allegedly unconstitutional activity.").

### C.     Municipal Expenditures

Nichols also contends that she has municipal taxpayer standing to bring this action on the basis of two expenditures by Rehoboth Beach: (1) the funds required to hold the special election and (2) the funds used to purchase an advertisement in a local newspaper. Neither of these expenditures is sufficient to grant Nichols standing. As such, she does not have municipal taxpayer standing to challenge the special election, and the District Court properly dismissed her complaint.

### 1.

We conclude that the expenditure of municipal funds to hold a special election is not sufficient to establish municipal taxpayer standing. Nichols alleged that the voting procedures at the special election—the six-month residency requirement and the ability of property owners to vote more than once—violated the Fourteenth Amendment. She did not assert that Rehoboth Beach expended funds on the allegedly unconstitutional aspects of the special election, i.e., the voting requirements. The special election itself would have been held regardless of the procedures Rehoboth Beach employed. In other words, Rehoboth Beach would have expended the funds necessary to hold the special election even if the voting requirements had been different.

As noted above, in *ACLU-NJ*, the plaintiffs could not show that the Township expended funds on the challenged element—the public display of religious symbols. Because the plaintiffs failed to establish an expenditure on the challenged elements of the holiday display, they could not show municipal taxpayer standing. *ACLU-NJ*, 246 F.3d at 263–64. Here, Nichols's concern is not that Rehoboth Beach held a special election to approve bonds but rather that some

of the requirements of the special election were unconstitutional. But the complaint fails to allege any direct link between the expenditure of municipal funds and the allegedly unconstitutional elements of the special election—and this failure is fatal to Nichols's claim.[3]

**2**.

Rehoboth Beach's purchase of an advertisement in a local newspaper similarly does not support municipal taxpayer standing in this instance. There is no dispute that Rehoboth Beach expended municipal funds when it purchased an advertisement alerting the public to the special election. Again, the purported illegality of the election procedures has nothing to do with the expenditure of funds for the advertisement—an appropriate expenditure. The

_____

[3] Even if there were a direct connection between the funds expended on the special election and the challenged voting practice, we would reach the same result. That de minimis costs were associated with the special election itself does not give rise to Article III standing. *ACLU-NJ*, 246 F.3d at 264 (requiring more than de minimis municipal expenditures to make a "good-faith pocketbook action"). The Dissent asserts that "the issuance of $52.5 million in municipal bonds cannot really be compared to the trivial amount of taxpayer money a municipality could have possibly spent to erect and light two discrete components of a seasonal holiday display." Dissent, Lines 116–19. Obviously not. But that comparison misses the mark since the $52.5 million at issue in this case was not expended on a challenged practice. By contrast, the challenged expenditure in *ACLU-NJ* was the cost of erecting and lighting the religious elements in the holiday display, which is comparable to the expense of holding the election here.

advertisement simply urged eligible voters to participate. Moreover, the cost is analogous to the types of expenses dismissed in *ACLU-NJ* as de minimis—such as the cost of electricity required to light the religious elements of a display. Accordingly, the advertisement does not qualify as the kind of "direct dollars-and-cents injury" required under *Doremus* for "a good-faith pocketbook action." *Doremus*, 342 U.S. at 434; *see also Fuller v. Volk*, 351 F.2d 323, 327 (3d Cir. 1965) ("[I]n order for the taxpayer to have standing, he must show that his position as a taxpayer is in some way affected . . . ."). This expenditure cannot, therefore, serve as a basis for municipal taxpayer standing.

## IV.

Because Nichols does not have standing as a municipal taxpayer, we will affirm the District Court's dismissal of her case for lack of subject matter jurisdiction.

*Nichols v. City of Rehoboth Beach, et al.,* No. 15-3979, dissenting.

COWEN, *Circuit Judge*.

I must respectfully dissent. The City of Rehoboth Beach held a special election to authorize a $52.5 million bond issuance, which was approved—637 votes to 606 votes. In Counts I and II of her amended complaint, Jackie Nichols alleged that Rehoboth Beach, Mayor Sam Cooper, and City Manager Sharon Lynn violated the Fourteenth Amendment by requiring individuals to reside in the municipality for at least six months in order to cast votes as Rehoboth Beach residents. In Count III, she claimed that Defendants violated "the 'one person, one vote' principle of the 14th Amendment" by allowing "individuals one vote for each parcel of property they owned in Rehoboth (directly or indirectly through an entity), in addition to one vote if they also resided in Rehoboth." (A12.) "Count IV was a pendent state law claim for 'exceeding authority' in which Nichols alleged that Rehoboth Beach had violated Delaware law by purchasing the newspaper advertisement encouraging voters to support the issuance of bonds." (Maj. Op. at 5.) Unlike the majority, I conclude that Nichols—as a municipal taxpayer—has Article III standing to bring her federal constitutional claims as well as her state law cause of action. In addition, I believe that, while she fails to satisfy the requirements for prudential standing with respect to Counts I and II, she has prudential standing to litigate Counts III and IV.

The majority appropriately points out that "[t]he Supreme Court has, however, allowed one form of taxpayer standing to survive: standing based on municipal taxpayer

1

status." (<u>Id.</u> at 9.)  Under the doctrine of municipal taxpayer standing, "[t]he interest of a taxpayer of a municipality in the application of its money is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." <u>Frothingham v. Mellon</u>, 262 U.S. 447, 486 (1923).  "In other words, under <u>Frothingham</u> we presume a municipal taxpayer's relationship to the municipality is 'direct and immediate' such that the taxpayer suffers concrete injury whenever the 'challenged activity involves a measurable appropriation or loss of revenue.'" <u>United States v. City of N.Y.</u>, 972 F.2d 464, 470 (2d Cir. 1992) (quoting <u>D.C. Common Cause v. Dist. of Columbia</u>, 858 F.2d 1, 5 (D.C. Cir. 1988)).  In fact, a number of judges have questioned whether this well-established approach—which dates back to the 1800s—is at odds with both modern standing principles as well as the contemporary realities of municipal financing and spending practices. <u>See, e.g.</u>, <u>Smith v. Jefferson Cty. Bd. of Sch. Comm'rs</u>, 641 F.3d 197, 221 (6th Cir. 2011) (en banc) (Sutton, J., concurring) (addressing "tension between the municipal-taxpayer-standing doctrine and modern standing principles"); <u>City of N.Y.</u>, 972 F.2d at 471 (questioning <u>Frothingham</u> presumption given existence of municipalities with multi-billion dollar budgets). According to the Sixth Circuit, "municipal taxpayers are able to rely on what would otherwise be labeled a generalized grievance," and they are thereby allowed "to sidestep the 'zone of interest' test that courts apply in other instances." <u>Smith v. Jefferson Cty. Bd. of Sch. Comm'rs</u>, 788 F.3d 580, 591 n.4 (6th Cir. 2015) (citing <u>Smith</u>, 641 F.3d at 222 (Sutton, J., concurring)), <u>cert. denied sub nom. Kucera v. Jefferson Cty. Bd. of Sch. Comm'rs</u>, 136 S. Ct. 1246 (2016). Yet "[t]he Supreme Court created the distinction and has stood by it for some time, requiring lower courts like ours to

apply it as is." <u>Smith</u>, 641 F.3d at 222 (Sutton, J., concurring) (citing <u>Rodriguez de Quijas v. Shearson/Am. Express Inc.</u>, 490 U.S. 477, 484 (1984)).

      I find that the District Court did not approach this generous notion of municipal taxpayer standing with the seriousness and care it deserves. "If standing is 'one of the most amorphous [concepts] in the entire domain of the public law,' <u>Flast v. Cohen</u>, [392 U.S. 83, 99 (1968)], nowhere is this better demonstrated than in the area of municipal taxpayer standing." <u>Warnock v. NFL</u>, 356 F. Supp. 2d 535, 540 (W.D. Pa.), <u>aff'd</u>, 154 F. App'x 291 (3d Cir. 2005). Nevertheless, the District Court merely cited general legal principles governing the standing inquiry and, without a detailed explanation, stated that it "agrees with Defendants that Nichols is not contesting the expenditure of tax funds, but the legality of the Special Election." <u>Nichols v. City of Rehoboth Beach</u>, C.A. No. 15-602 GMS, 2015 WL 8751180, at *3 (D. Del. Dec. 14, 2015). Unlike the majority, the District Court did not discuss any municipal taxpayer cases or address the governing principles of this doctrine. The majority, in any event, recognizes that we exercise de novo review over the District Court's dismissal on standing grounds. <u>See, e.g.</u>, <u>Edmonson v. Lincoln Nat. Life Ins. Co.</u>, 725 F.3d 406, 414 (3d Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 2291 (2014). "In examining a challenge to a party's standing, the Court must accept as true all material allegations set forth in the complaint and construe those facts in favor of the nonmoving party." <u>Nichols</u>, 2015 WL 8751180, at *2 (citing <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975); <u>Storino v. Borough of Point Pleasant Beach</u>, 322 F.3d 293, 296 (3d Cir. 2003)). General factual allegations of injury resulting from the defendant's actions may be sufficient at the motion to

dismiss stage.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

To satisfy the standing requirements of Article III, a plaintiff must show that:  (1) he or she has suffered an injury in fact "that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" (2) the injury is fairly traceable to the defendant's challenged action; and (3) it is likely that the injury will be redressed by a favorable decision.  Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan, 504 U.S. at 560-61).  In order to meet the injury requirement, a municipal taxpayer must establish a so-called "good-faith pocketbook" injury.  See, e.g., ACLU-NJ v. Twp. of Wall, 246 F.3d 258, 262 (3d Cir. 2001) ("[A] municipal taxpayer may possess standing to litigate 'a good faith pocketbook action.'" (citing Doremus v. Bd. of Educ., 342 U.S. 429 (1952))); see also, e.g., Fuller v. Volk, 351 F.2d 323, 327 (3d Cir. 1965) (stating that, in order to have standing, plaintiff must show position as taxpayer is in some way affected and, in short, that action constitutes good-faith pocketbook action). A municipal taxpayer establishes a good-faith pocketbook injury by showing "a measurable appropriation or disbursement" of public funds "occasioned solely by the activities complained of." Doremus v. Bd. of Educ., 342 U.S. 429, 434 (1952) (citing Everson v. Bd. of Educ., 330 U.S. 1 (1947)); see also, e.g., D.C. Common Cause v. Dist. of Columbia, 858 F.2d 1, 4 (D.C. Cir. 1988) ("One commentator has interpreted Doremus as requiring a taxpayer to challenge an activity involving an expenditure of public funds that would not otherwise be made." (citing Note, Taxpayers' Suits:  A Survey and Summary, 69 Yale L.J. 895, 922 (1960))).

According to Nichols, she has an interest as a municipal taxpayer in challenging "the unlawful incurring of municipal debt by issuing bonds to be repaid from tax funds." (Appellant's Brief at 11 (footnote omitted).)  She also points to the Defendants' use of taxpayer funds to purchase a newspaper advertisement and to conduct the special election.  I believe that the proposed issuance of $52.5 million in general obligation bonds—based on an election conducted pursuant to allegedly unconstitutional voting rules and decided by a mere thirty-one votes—satisfies the injury requirement.  Likewise, this bond issuance meets the causation and redressability prongs.  Because Nichols thereby has Article III standing to pursue her federal constitutional claims, I need not—and do not—consider whether the election expenditures likewise meet these standing requirements.  In addition, I conclude that the use of taxpayer money to purchase an advertisement in a local newspaper satisfies the requirements for Article III standing with respect to Nichols's state law cause of action.

The proposed bond issuance constitutes a "good-faith pocketbook" injury.  In ACLU-NJ v. Township of Wall, 246 F.3d 258 (3d Cir. 2001), two taxpayers challenged on Establishment Clause grounds the inclusion of a crèche and a menorah in a holiday display erected near the entrance to the township's municipal building, id. at 260.  We determined that the plaintiffs failed to carry "their burden of proving an expenditure of revenues to which they contribute that would make their suit 'a good-faith pocketbook action.'"  Id. at 264 (quoting Doremus, 342 U.S. at 434).  The Court explained that, even if we were to assume that the display was erected by paid municipal employees, "there is no indication that the

portion of such expenditure attributable to the challenged
elements of the display would have been more than the de
minimis expenditure that was involved in the Bible reading in
Doremus [in which the teacher or school principal was
responsible for the readings]." Id. at 264 (citing Doremus v.
Bd. of Educ., 71 A.2d 732, 733 (N.J. Super. Ct. 1950); Doe v.
Madison Sch. Dist. No. 321, 177 F.3d 789, 794 (9th Cir.
1999) (en banc)). Similarly, the ACLU-NJ Court refused to
assume that the township expended more than a de minimis
amount of money to light the display's religious elements. Id.
After all, the display also featured an evergreen tree,
decorated urns, and candy can banners. Id. at 260. However,
the issuance of $52.5 million in municipal bonds cannot
really be compared to the trivial amount of taxpayer money a
municipality could have possibly spent in order to erect and
light two discrete components of a seasonal holiday display.
This appeal instead implicates millions of dollars in debt
"backed by the full faith and credit of the issuing
municipality" and payable "by tax revenue." In re Smurfit-
Stone Container Corp., 425 B.R. 735, 737 n.2 (Bankr. D. Del.
2010) (citing Greenberg, Municipal Sources:  Some Basic
Principles and Practices, 9 Urb. Law. 340-41 (1977)). Such
indebtedness clearly represents a measurable liability or
encumbrance of the municipality. Given the nature of the
relationship between a municipality and municipal
taxpayers—"which is not without some resemblance to that
subsisting between stockholder and private corporation,"
Frothingham, 262 U.S. at 487 (citing 4 Dillon, Municipal
Corporations § 1580 et seq (5th ed.))—this liability in turn
constitutes a burden on the taxpayers themselves, see, e.g.,
Crampton v. Zabriskie, 101 U.S. 601, 609 (1879) ("[I]t would
seem eminently proper for courts of equity to interfere upon
the application of the taxpayers of a county to prevent the

consummation of a wrong, when the officers of those corporations, assume, in excess of their powers, to create burdens upon property-holders.").

According to the majority, Nichols "has not challenged the expenditure of the $52.5 million, merely the special election that approved the issuance of the bonds." (Maj. Op. at 6.) Purportedly, "[b]ecause the $52.5 million was not spent on an illegal practice, Nichols cannot assert municipal taxpayer standing to challenge the expenditure." (Id. at 13.) I nevertheless believe that an expenditure of taxpayer money specifically "approved" by a special election conducted under unconstitutional voting rules constitutes "an illegal practice." These two components—i.e., the expenditure and the election approving the expenditure—should not be severed in the manner suggested by the majority. After all, the legality of the bond issuance itself depends on the special election and its outcome—which, in this case, was decided by thirty-one votes. Could an expenditure really be considered anything other than "an illegal practice" where the requisite election approving the expenditure itself violated "the 'one person, one vote' principle of the 14th Amendment" as well as basic constitutional principles governing voter residency requirements? (A12.)

Federal "municipal taxpayer" cases also indicate that Nichols satisfies the injury requirement with respect to the proposed bond issuance and the underlying special election. ACLU-NJ had already been fully litigated on the merits, and the plaintiffs accordingly had the burden of proving their standing "'in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at successive stages of the

litigation.'" <u>ACLU-NJ</u>, 246 F.3d at 261 (quoting <u>Lujan</u>, 504 U.S. at 561). This matter comes to us on a motion to dismiss. As the District Court acknowledged, we must accept as true all material allegations set forth in the complaint, and general factual allegations of injury may be sufficient at this early stage of the litigation. <u>See, e.g.</u>, <u>Lujan</u>, 504 U.S. at 561; <u>Warth</u>, 422 U.S. at 501. In addition, I have already highlighted the generous nature of the municipal taxpayer standing doctrine. In fact, a municipal taxpayer need not show there is a likelihood of any resulting savings that will inure to his or her benefit, <u>see, e.g.</u>, <u>City of N.Y.</u>, 972 F.2d at 466, or "a net loss to the municipal fisc," <u>Smith</u>, 641 F.3d at 212 (citing, inter alia, <u>ACLU-NJ</u>, 246 F.3d at 262). In <u>Crampton v. Zabriskie</u>, 101 U.S. 601 (1879), the Supreme Court concluded that county taxpayers had standing to challenge a bond issuance on the grounds that the issuance violated a state statute limiting the county's total expenditures to the amount of money it raised by taxes, <u>id.</u> at 607-09. We similarly should permit a taxpayer to challenge a bond issuance on the grounds that it is based on an election conducted in an unconstitutional manner.

As Nichols points out, a number of state supreme courts have held that municipal taxpayers possessed the requisite standing to challenge the issuance of bonds on the grounds of underlying electoral illegalities. Relying on the United States Supreme Court's ruling in <u>Crampton</u>, the Virginia Supreme Court of Appeals stated that, "[w]henever a citizen and taxpayer is confronted with the proposition that an illegal election for the issuance of bonds has been held and the issuance of the bonds will result in the imposition of an illegal tax burden upon him, he has the right to proceed either in equity to enjoin the issuance of the bonds . . . or to proceed

by filing a petition in the pending matter." <u>Appalachian Elec. Power Co. v. Town of Galax</u>, 4 S.E.2d 390, 392 (Va. 1939). The Idaho Supreme Court concluded that a municipal taxpayer could contest the result of a special bond election— and the official declaration of the election result—on the grounds that several identified persons were permitted to vote even though they were not qualified to do so (and that, without these votes, the proposition would not have passed). <u>Henley v. Elmore Cty.</u>, 242 P.2d 855, 856-57 (Idaho 1952). More recently, Maine's highest court allowed a taxpayer to challenge a municipality's attempt to incur debt based on what the taxpayer believed was an unlawful recounting of previously rejected absentee ballots. <u>McCorkle v. Town of Falmouth</u>, 529 A.2d 337, 337-39 (Me. 1987). Even Defendants acknowledge that the <u>McCorkle</u> and <u>Henley</u> courts allowed the respective taxpayers to "challenge municipality's vote count." (Appellees' Brief at 16 n.9 (citing <u>Henley</u>, 242 P.2d at 857; <u>McCorkle</u>, 529 A.2d at 338).) If a municipal taxpayer has standing to challenge the vote count, why wouldn't he or she have the right to challenge the constitutionality of the basic rules the municipality used to decide who may vote—and how many votes they may cast?[1]

---

[1] While we should approach state court case law applying standing principles with some caution, <u>see, e.g.</u>, <u>Rocks v. City of Phila.</u>, 868 F.2d 644, 647 (3d Cir. 1989) (rejecting plaintiffs' argument that "we should apply Pennsylvania case law respecting the broad rights of municipal taxpayers to sue local government agencies"), I find that these bond election opinions have special significance given the fact that neither the majority nor Defendants themselves cite to any contrary federal (or even

Likewise, Nichols's pendent state law claim constitutes a good-faith pocketbook action. The majority compares the expense of buying a single newspaper advertisement with the potential de minimis costs of erecting and lighting the religious elements of the seasonal holiday display at issue in <u>ACLU-NJ</u>. However, the taxpayers' Establishment Clause claim implicated the purported costs of erecting and lighting the crèche and menorah—as opposed to what the township may have spent to erect and light the display in its entirety. In contrast, Nichols does not merely challenge some minor component of a municipal expenditure. She instead alleged that it was the purchase of the newspaper advertisement itself that violated Delaware state law. According to her amended complaint, "Rehoboth, utilizing taxpayer funds (on information and belief), caused to be published in a local newspaper a full-page advertisement exhorting people to 'Vote Yes,' *i.e.,* in favor of the proposed outfall project, and presenting a one-sided view of the project, without affording opponents the opportunity by means of that financed medium to present their side." (A12-A13.) "The expenditure is not within Rehoboth's express or implied power and so is unlawful." (A13.) While it may not have cost the municipality and its taxpayers that much money to purchase a single advertisement, "'[m]unicipal taxpayer standing simply requires the "injury" of an allegedly

---

state) case law that specifically consider whether a taxpayer has standing to challenge a bond issuance based on purported irregularities in the bond election. This case law also appears to be consistent with the generous doctrine of taxpayer standing recognized by the United States Supreme Court. <u>See</u> <u>Appalachian Elec. Power Co.</u>, 4 S.E.2d at 392 (quoting <u>Crampton</u>, 101 U.S. at 609).

improper expenditure of municipal funds'" (Maj. Op. at 13 n.2 (quoting Cammack v. Waihee, 932 F.2d 765, 770 (9th Cir. 1991))).  See, e.g., D.C. Common Cause, 858 F.2d at 9 ("Although the factual record on this allegation is sparse, we think appellees have made a sufficient showing to avoid dismissal for lack of standing.  The District spent $7,000 in the 1984 campaign [to influence the outcome of an initiative], which is evidence that it may do so again." (citation omitted)).

"Injury is only the first part of the standing analysis; the plaintiff must also establish that the challenged action caused the injury and that the injury would be redressed by a favorable decision."  Id. at 5 (citing Allen v. Wright, 468 U.S. 737, 751 (1984)).  Defendants insist that, "[b]ecause the Delaware General Assembly adopted the voting requirements contained in the City's Charter, the 'causation' prong is not satisfied because the challenged conduct is not caused by the City, rather it is 'th[e] result [of] the independent action of some third party not before the court'—the State." (Appellees' Brief at 21 (quoting Lujan, 504 U.S. at 560-61).) In fact, Defendants repeatedly attempt to shift the focus—and blame—from themselves to the State of Delaware. Nevertheless, it was Defendants' choice to undertake a special election, to enforce the allegedly unconstitutional voting rules set forth in the City Charter, and to incur millions of dollars in municipal debt on the basis of what turned out to be a closely contested election.  "[G]overnment officials are not bound to follow state law when that law is itself unconstitutional.  Quite the contrary:  in such a case, they are bound *not* to follow state law."  Carhart v. Steinberg, 192 F.3d 1142, 1152 (8th Cir. 1999), aff'd, 120 S. Ct. 2597 (2000).  Nichols likewise seeks only prospective relief, and

the doctrine of qualified immunity does not apply to such claims.  See, e.g., Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006).

More generally, I find that Plaintiffs satisfy both the causation and redressability elements.  As the majority notes, "municipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds." Cammack v. Waihee, 932 F.2d 765, 770 (9th Cir. 1991).  In this case, the "injury" consists of a proposed multi-million dollar bond issuance—which was based on a special election decided by a mere thirty-one votes pursuant to voting rules that allegedly violated the Fourteenth Amendment.  In turn, the federal judiciary could provide redress by, inter alia, enjoining Defendants from issuing any bonds if they fail to conduct an election that complies with the United States Constitution.[2]  With respect to the state law claim, Nichols specifically alleged an improper expenditure of funds—the purchase of a newspaper advertisement presenting a one-sided view of the proposed project—which could be remedied by declaratory or injunctive relief.  See, e.g., D.C. Common Cause, 858 F.2d at 9 ("Appellees' injury—the District's

---

[2] While Defendants take issue with Nichols's failure to raise her objections until after the special election took place, they do not cite to any case specifically holding that the respective plaintiffs lacked standing because they failed to object before the election or took too long to file their lawsuit (and, in two of the decisions they cite, the courts actually determined that the plaintiffs possessed standing, see Fulani v. Hogsett, 917 F.2d 1028, 1030 (7th Cir. 1990); Soules v. Kauaians for Nukoli Campaign Comm., 849 F.2d 1176, 1179 (9th Cir. 1988)).

future misuse of public funds [to influence the outcome of initiatives]—will be redressed by an injunction prohibiting such expenditures.").

Having determined (unlike the majority) that Nichols possesses standing under Article III to pursue her constitutional and state law claims, I must also consider whether she satisfies the requirements for prudential standing. In Rocks v. City of Philadelphia, 868 F.2d 644 (3d Cir. 1989), several city taxpayers and residents "asserted an equal protection violation resulting from the application of minority business enterprise participation requirements ('MBE') to a city construction project," id. at 645. We agreed with the district court that these plaintiffs—as municipal taxpayers—had Article III standing. Id. at 648. However, "[t]he question is whether these appellants have sustained a proximate, individual, and addressable injury, based solely upon their status as municipal residents and taxpayers." Id. Relying on our earlier ruling in Frissell v. Rizzo, 597 F.2d 840 (3d Cir. 1979), abrogation on other grounds recognized by Amato v. Wilentz, 952 F.2d 742 (3d Cir. 1991), the Rocks Court concluded that the plaintiffs had not satisfied these prudential requirements. Rocks, 868 F.2d at 648. Frissell, a Philadelphia taxpayer, sought to enjoin the mayor from denying customary public advertising to a newspaper in retaliation for unfavorable news articles, although the newspaper had not joined in the lawsuit or filed its own action against the city. Id. "Similarly, in this case no business enterprise or construction worker, those most likely to have suffered injury under the challenged bid specifications, has joined the complaint or brought suit to enjoin the city. The appellants here are solely taxpayers, resting their claim on the legal rights and interests of third parties, to-wit, those

13

business entities and workers not qualifying under the MBE requirements." Id.; see also Warnock, 356 F. Supp. 2d at 546 ("Rocks suggests that plaintiff is required to establish more than an injury received 'solely' on his status as a municipal taxpayer in order to overcome prudential standing limitations.").

In light of Rocks (and Frissell), I conclude that Nichols lacks prudential standing to bring Counts I and II challenging the imposition of a sixth-month residency requirement.  But I reach the opposite conclusion with respect to her state law cause of action (Count IV) as well as her claim (Count III) alleging that Defendants violated the Fourteenth Amendment by allowing property owners to vote more than once in the special election.  On the one hand, Nichols satisfied the sixth-month residency requirement and accordingly was allowed to vote in the special election—which she did.  No disqualified voter, "those most likely to have suffered injury under [this residency requirement]," has joined this litigation or filed their own actions against Defendants.  Rocks, 868 F.2d at 648.  On the other hand, a rule granting multiple votes to property owners—as well as a bond issuance based on the outcome of a closely contested election conducted under such a voting rule—directly affected Nichols herself.  The purchase of an allegedly illegal newspaper advertisement similarly injured her.  She accordingly need not rest her claim on "the legal rights and interests of third parties." Id.  While new residents disqualified from voting in the election would appear to be the most appropriate parties to challenge the residency requirement, I question whether anyone else would be a more suitable plaintiff to litigate either the "one person, one vote" claim or the pendent state law cause of action.

In conclusion, I would affirm the District Court's order in part and vacate it in part. The order would be affirmed insofar as it dismissed Counts I and II of the amended complaint. Otherwise, I would vacate the order insofar as it dismissed Counts III and IV.